UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
SCIENTIFIC COMPONENTS            :
CORPORATION d/b/a MINI-CIRCUITS  :
LABORATORY,                      :
                                 :
                 Plaintiff,      :     **MEMORANDUM AND ORDER**
                                 :     02 CV 5426 (DLI) (CLP)
            -against-            :
                                 :
ISIS SURFACE MOUNTING, INC.,     :
                                 :
                 Defendant.      :
---------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Scientific Components Corporation, d/b/a Mini-Circuits Laboratory ("Mini-Circuits" or "Plaintiff") brings this breach of contract action against defendant ISIS Surface Mounting, Inc. ("ISIS" or Defendant"), alleging that Defendant repudiated the contract between the parties by cancelling orders it had placed with Plaintiff. Plaintiff now moves for summary judgment finding Defendant liable for breach of contract and awarding Plaintiff damages, as a lost-volume seller, in the amount of $382,773.31, plus interest and attorneys' fees. Defendant claims that no contract existed between the parties and that, in any event, Plaintiff is not a lost-volume seller and is not entitled to any damages. Defendant cross-moves for summary judgment dismissing this action.

The court finds that a contract existed between the parties and that Defendant breached the contract. However, as described below, Plaintiff does not qualify as a lost-volume seller. Accordingly, Plaintiff's motion for summary judgment is granted with respect to the issue of breach of contract liability but not with respect to Plaintiff's damages claim. Defendant's motion is denied. The calculation of damages is referred to United States Magistrate Judge Cheryl L. Pollak.

1

**I.    Background**

   **A.    Parties**

Mini-Circuits is a New York corporation that manufactures and sells electronic components primarily used in the wireless communications industry. (Compl. ¶¶ 1, 7.) Proxim Corporation ("Proxim"), a Delaware corporation, is a manufacturer of wireless networking equipment and is the successor-in-interest to Western Multiplex Corporation ("Western Multiplex").[1] (Compl. ¶¶ 2-3, 8.) ISIS is a California corporation in the business of manufacturing electronic equipment. (Compl. ¶¶ 4, 9.)

   **B.    Facts**

The following facts are undisputed unless otherwise indicated. Sometime during or prior to January 1999, Western Multiplex engaged ISIS to manufacture component parts for electronic equipment. (Def.'s Mem. 1.) Subsequently, Western Multiplex contacted Mini-Circuits and requested that Mini-Circuits sell electronic components to ISIS and extend any established pricing agreements and volume discounts to ISIS. (Def.'s 56.1 ¶ 1.) Starting 1999 until December 2000 or later, ISIS placed numerous orders for the purchase of electronic components from Mini-Circuits. (Def.'s 56.1 ¶ 3; Pl.'s Resp. 56.1 ¶ 3; Pl.'s 56.1 ¶ 2.)

To place an order, ISIS submitted to Mini-Circuits purchase order forms listing the items

---

[1] Proxim was originally named as a defendant in this action. On June 11, 2005, Proxim filed bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware. Pursuant to 11 U.S.C. § 363, all actions against Proxim were stayed. Subsequently, Plaintiff moved to sever its claims against ISIS and to proceed against ISIS separately from Proxim. In a Report and Recommendation issued December 15, 2005 ("Recommendation"), Magistrate Judge Pollak recommended that the court sever Plaintiff's claims against ISIS from those against Proxim and that Plaintiff be allowed to proceed on its claims against ISIS. This court adopted Judge Pollak's Recommendation on January 26, 2006.

ordered, the quantity, the price, and the anticipated delivery date. (*See* Pl.'s 56.1 Ex. D.) In addition, each purchase order form contained the following language displayed in all-capital letters: "ISIS RESERVES THE RIGHT TO CHANGE THIS PO IN ITS ENTIRETY OR IN PART, WITHIN 30 CALENDER [*sic*] DAYS [*sic*] NOTICE WITH NO LIABILITY TO ISIS." (*See* Pl.'s 56.1 Ex. D.) In response to ISIS' orders, Mini-Circuits sent acknowledgment forms listing the items ordered, the quantity, the price, the shipment method, and the delivery date. (*See* Pl.'s 56.1 Ex. D.) Each acknowledgment form also stated in all-capital letters: "ACCEPTANCE OF YOUR COMPANY'S ORDER IS EXPRESSLY MADE CONDITIONAL ON YOUR COMPANY'S ASSENT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE OF THIS ACKNOWLEDGMENT; THESE TERMS AND CONDITIONS ARE ALSO CONTAINED ON THE REVERSE SIDE OF MINI-CIRCUITS' INVOICE." (*See* Pl.'s 56.1 Ex. D.) The relevant disputed term contained on the reverse side of the acknowledgment form stated that, "[n]otwithstanding the rights of Company contained herein, Purchaser shall not have the right to accelerate, postpone, cancel (other than as provided in Paragraph 7) or otherwise modify delivery dates specified on the face hereof. If Purchaser attempts to do so, it will be deemed to have repudiated this contract." (Pomerantz Decl. Ex. 4 ¶ 4(c).) Paragraph seven of Mini-Circuits' terms and conditions permitted the purchaser to cancel only in the event of excessive delay. (Pomerantz Decl. Ex. 4.) ISIS never expressly assented to the terms and conditions set forth in Mini-Circuits' acknowledgment forms. (*See* Def.'s 56.1 ¶ 9.)

On March 28, 2001, ISIS cancelled all of its open orders with Mini-Circuits, stating that "Western Multiplex has cancelled with us so we have no requirements." (Def.'s Ex. 11.) Plaintiff alleges that the agreed-upon price of the items Defendant cancelled (the "cancelled items") was

$817,101.16. (Compl. ¶ 14.) The components ISIS cancelled were standard catalogue items. (Def.'s 56.1 ¶ 16.) The items manufactured for ISIS bore identifying "run numbers but were not segregated from other similar parts." (Def.'s 56.1 ¶¶ 19, 21.)

Starting March 28, 2001, Mini-Circuits re-sold some portion of the cancelled components to Pemstar and SMTC, subcontractors engaged by Western Multiplex for the same project for which ISIS had previously been engaged. (*See* Def.'s 56.1 ¶¶ 23-25; Def.'s Exs. 6, 8, 9.) ISIS also claims that, after its March 28 cancellation, it re-scheduled delivery of $162,43.16 of the cancelled items. (Def.'s 56.1 ¶ 20.) In addition, Mini-Circuits purportedly re-sold a portion of the cancelled components directly to Western Multiplex and other third parties. (*See* Def.'s 56.1 ¶ 28; Def.'s Exs. 14, 17.) However, Mini-Circuits claims that, despite reasonable efforts,[2] it was unable to re-sell some of the cancelled items. (*See* Pl.'s 56.1 ¶ 40; Pomerantz Decl. Ex. 5.) Mini-Circuits did not credit any re-sales or re-scheduled deliveries against the amount it claimed ISIS owed. (Def.'s 56.1 ¶¶ 21, 27.)

Dispute over cancellation charges ensued. (*See* Def.'s 56.1 ¶ 31; Def.'s Exs. 3, 10.) On January 21, 2002, Lelsey Barretta of ISIS sent an electronic mail ("e-mail") to "Kevin" of Mini-Circuits, with a carbon copy to others, objecting to Mini-Circuits' most recent calculation of the cancellation charges. She wrote,

> As we have stated since the beginning of this ordeal, ISIS PO's clearly state that we can revise or cancel our orders outside of standard lead time with NO liability to ISIS. In addition all of the parts we canceled are standard catalog items, therefore not NC NR. When we originally received your cancellation charges they were approximately $313k, now you have added almost $500k.?? This is not acceptable. We gave you a spreadsheet indicating the corrections that needed to be made to the original charges, bringing the total to $221,134.08. As requested by ISIS and Western Multiplex, the orders received from Pemstar

---

[2] Mini-Circuits does not explain what efforts it made to sell the items it was unable to re-sell.

4

> and SMTC were to be deducted from the orders we canceled. This did not happen. We are working on resolving the remaining issues with Western, but we need realistic numbers from our suppliers. Please review your information and send me a number we can work with.

(Pl.'s 56.1 Ex. B; *see also* Pomerantz Decl. Ex. 3.)

On October 8, 2002, Mini-Circuits filed the instant action. Mini-Circuits now moves for summary judgment, and ISIS cross-moves for summary judgment.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 1776.

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is

so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted).

**B.  Contract Formation**

The first issue is whether a contract existed between ISIS and Mini-Circuits. ISIS claims that no contract existed, pursuant to section 2-207(1) of the Uniform Commercial Code ("U.C.C. § 2-207"), and Mini-Circuits, unsurprisingly, argues the contrary, contending that a contract existed based on the parties' conduct.

The court holds that an enforceable contract existed between ISIS and Mini-Circuits. U.C.C. § 2-207(1) states that

> [a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

In this case, Mini-Circuits' acknowledgment forms set forth additional and/or different terms and, furthermore, clearly stated that "ACCEPTANCE OF YOUR COMPANY'S ORDER IS EXPRESSLY MADE CONDITIONAL ON YOUR COMPANY'S ASSENT TO THE TERMS AND CONDITIONS ON THE FACE AND REVERSE SIDE OF THIS ACKNOWLEDGMENT."[3] (*See* Pl.'s 56.1 Ex. D.) Accordingly, under U.C.C. § 2-207, Mini-Circuits' forms did not serve as acceptances establishing contractual obligations but, instead, operated as counteroffers. *See Stemcor*

---

[3]ISIS asserts, in its Memorandum of Law in Support of its Motion for Summary Judgment, that Mini-Circuits' invoice reiterated the conditional language contained in the acknowledgment forms and further stated, "If your company does not assent to such terms, there is no contract." In support of this assertion, ISIS cites to its Exhibit 7. However, ISIS did not include an Exhibit 7 in its submissions to the court.

*USA, Inc. v. Trident Steel Corp.*, 471 F. Supp. 2d 362, 367 (S.D.N.Y. 2006) ("If . . . the seller's response is 'expressly made conditional on assent' to the divergent terms, then the proviso in *paragraph (1)* [of U.C.C. § 2-207] provides that no contract is formed, and instead the seller's response constitutes a counteroffer."); *C. Itoh & Co. v. Jordan Int'l Co.*, 552 F.2d 1228, 1235-36 (7th Cir. 1977) (applying New York law, holding the same).

Although ISIS did not explicitly accept Mini-Circuits' counteroffers, pursuant to U.C.C. § 2-207(3), "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." Here, both ISIS' prior and subsequent conduct reflects its understanding that a contract was created between the parties in the instant conflict. Mini-Circuits and ISIS had conducted business apparently without any problems from 1999 to March 2001. Starting 1999, ISIS sent Mini-Circuits purchase order forms, and Mini-Circuits, in turn, sent ISIS acknowledgment forms containing the aforementioned conditional acceptance language. Through this exchange of forms, the parties agreed upon the material terms concerning price and quantity. In addition, the parties engaged in negotiations over shipping dates. Although ISIS never expressly assented to Mini-Circuits' acknowledgment forms, neither did ISIS object to the forms or engage in any behavior suggesting it did not intend to enter into a contractual relationship. Instead, ISIS continued to submit additional purchase order forms. This conduct serves as some evidence of its intent to enter into contractual obligations with Mini-Circuits.

In addition, subsequent to ISIS' March 28, 2001 cancellation e-mail, Mini-Circuits apparently sent ISIS a bill for cancellation charges amounting to "almost $500k." (*See* Def.'s Resp. 56.1 ¶ 21; Pl.'s 56.1 Ex. B.) Although ISIS objected to the imposition of the cancellation charges in general,

7

ISIS nonetheless asserted that Mini-Circuits' calculation should be corrected to $221,134.08, and sent Mini-Circuits a spreadsheet it had prepared setting forth its calculation of the cancellation charges. (Pl.'s 56.1 Ex. B; Pomerantz Decl. Ex. 3.) Moreover, ISIS asked Mini-Circuits to "review your information and send me a number we can work with." (Pl.'s 56.1 Ex. B.) It is clear to the court, based on the foregoing evidence concerning ISIS' prior and subsequent conduct, that ISIS intended to enter into a contract and, further, that ISIS understood that it had entered into a valid and enforceable contract when it cancelled its order. Therefore, an enforceable contract existed between ISIS and Mini-Circuits.

### C. Contract Terms

Both Mini-Circuits and ISIS expend a considerable amount of effort in their submissions debating the issue of whose, if either's, cancellation provision controls. However, regardless of whose cancellation provision applies, if either's, ISIS breached the contract and is liable for its breach.

Mini-Circuits argues that its cancellation clause, which does not permit ISIS to cancel orders for convenience, became a part of the contract. ISIS argues, however, that Mini-Circuits' provision concerning cancellation rights was "knocked out" by its own conflicting cancellation clause listed on its purchase order forms, which provided that ISIS was able to change its order for any reason within thirty calendar days of the order. ISIS provides no dispute to Mini-Circuits' assertion that ISIS failed to cancel within its own thirty-day cancellation period.

Mini-Circuits' cancellation clause does not control here. When a contract is not established by the parties' writings but rather by the parties' conduct, under U.C.C. § 2-207(3), "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with

8

any supplementary terms incorporated under any other provisions of this Act." ISIS' cancellation provision stated that "ISIS RESERVES THE RIGHT TO CHANGE THIS PO IN ITS ENTIRETY OR IN PART, WITHIN 30 CALENDER [*sic*] DAYS [*sic*] NOTICE WITH NO LIABILITY TO ISIS." (*See* Pl.'s 56.1 Ex. D.) Mini-Circuits' cancellation clause stated, in pertinent part, that "Purchaser is entitled to cancel only that portion of any order which is excessively delayed" and thus did not permit ISIS to cancel within thirty days, as provided in ISIS' cancellation clause. (*See* Pomerantz Decl. Ex. 4.) The parties' writings do not agree on what ISIS' cancellation rights were under the contract; thus, pursuant to U.C.C. § 2-207(3), neither clause became a part of the agreement, and the U.C.C. supplies any missing terms. *See Stemcor USA, Inc.*, 471 F. Supp. 2d at 367 (stating that, when the parties' conduct recognizes the existence of a contract, "*paragraph (3) of section 2-207* defines the terms of the agreement as those upon which the parties agree together with any supplemental default terms provided elsewhere in the U.C.C.").

Although the U.C.C. does not provide terms concerning cancellation rights that would be appropriate here, the instant legal problem requires only an application of basic contract principles. ISIS appears to argue that, if Mini-Circuits' cancellation provision does not apply, ISIS escapes any liability at all. This argument is entirely untenable. As to the first thirty days after ISIS submitted a purchase order, it is unclear whether ISIS had the ability to alter or cancel the order, as discussed above. As to the ensuing period, however, the parties' writings do not provide any dispute that both parties were under a contractual obligation to perform. Moreover, neither the U.C.C. nor contract law permits a party to a contract to cancel its obligations without liability. It is thus clear that ISIS' cancellation constituted an anticipatory repudiation of its contractual obligations, for which it is liable.

9

D.   **Damages**

1.   **Lost Volume Seller**

Damages for breach of contract should "put the plaintiff in as good a position as he would have been in had the defendant abided by his agreement." *Wallace Steel, Inc. v. Ingersoll-Rand Co.*, 739 F.2d 112, 115 (2d Cir. 1984). Normally, when a purchaser repudiates a contract, the seller may recover "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages . . . but less expenses saved in consequence of the buyer's breach." U.C.C. § 2-708(1). However, if the foregoing calculation

> is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

U.C.C. § 2-708(2). Mini-Circuits contends that it should be regarded as a lost-volume seller, pursuant to subsection (2) above, and is entitled to receive its lost profits. ISIS argues that Mini-Circuits does not qualify as a lost-volume seller and is limited to subsection (1).

The court holds that Mini-Circuits does not qualify as a lost-volume seller. "A lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *In re WorldCom, Inc.*, 361 B.R. 675, 685 (S.D.N.Y. 2007) (citation omitted); *see also Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 399-400 (1972). The expectation of a lost-volume seller is two-fold: the profit from the breached contract and the profit from other contracts it could also have performed at the same time as the breached contract. *In re WorldCom, Inc.*, 361 B.R. at 685; *see also Neri*, 30 N.Y. 2d at 400. In order for the court to determine that Mini-Circuits is a lost-volume seller, Mini-Circuits must

10

demonstrate both that it had the subjective intent, regardless of ISIS' cancellation, to take on the additional sales it made following the cancellation and that it objectively possessed the capacity to make the additional sales without expenditures and overhead expenses beyond those that would have been incurred had ISIS not breached. *See Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008-09 (S.D.N.Y. 1991).

Mini-Circuits has failed to satisfy the subjective intent element. SMTC and Pemstar, subcontractors of Western Multiplex, ordered a significant number of ISIS' cancelled components for use in the same project ISIS had ordered the products for. (*See, e.g.,* Def.'s Ex. 15.[4]) Although Mini-Circuits claims SMTC and Pemstar's orders are merely "red herrings," the court entirely disagrees. Several correspondence exchanged between Western Multiplex and Mini-Circuits, and internally within Mini-Circuits, reflect the fact that SMTC and Pemstar were to assume, at least in part, the orders placed by ISIS:

> March 28, 2001 internal Mini-Circuits e-mail from Pat Killen to Kevin Scott and Mandy Chiu: "Please contact Western Multiplex ASAP to determine who[m] they have gone to for their new CM . . . . We are going to need to be able to get a commitment for new orders and or book replacement orders with Western Multiplex or their new CM in order to minimize the cancellation charges as a result of the ISIS cancellation. (Def.'s Ex. 11.)
>
> March 29, 2001 e-mail from Veronica McAuliffe of Western Multiplex to Mark Shiman of Mini-Circuits: "Any orders which Pemstar or SMTC plcase [*sic*] with Mini Circuits for this material should be *deducted from The* [*sic*] *Isis back log* [*sic*]. Please make the necessary adjustments on the order placed by Pemstar yesterday." (Def.'s Ex. 6, emphasis added.)
>
> April 19, 2001 internal Mini-Circuits e-mail from Kevin Scott to Shiman: "Please, review the attached *transitional* spread sheet sent [*sic*] by David Shoon at SMTC. This lists orders that SMTC is picking up for ISIS. The open order qty for ISIS is way off." (Def.'s Ex. 15, emphasis added.)

---

[4]The documents in Defendant's Exhibit 15 reflect early negotiations between Mini-Circuits and SMTC. The court is unable to discern from the record the actual purchases made by SMTC, Pemstar, and Western Multiplex.

> April 19, 2001 internal Mini-Circuits e-mail from Shiman to Loretta Crum: "Here is what SMTC sent Kevin for the *transfer POs*. Kevin indicates the open qty is off." (Def.'s Ex. 15, emphasis added.)
>
> May 9, 2001 letter from a Mini Circuits representative to McAuliffe: "Mini-Circuits acknowledges your company's assumption of the [open orders for parts initially placed by your subcontractor ISIS on behalf of your company (the "Open Orders")] and that new orders placed by your company or one of your company's approved subcontractors for the same parts covered by the Open Orders will be applied against the Open Orders provided they are for use on the Western Multiplex project." (Def.'s Ex. 8.)
>
> June 11, 2001 internal Mini-Circuits e-mail: "[B]ottom line we are looking to hear from West Mux they will burn off the material for which ISIS has committed or at least to understand how much of it they do believe they'll consume with Pemstar and SMTC after ISIS goes away in four months. With this info, we can then make an educated decision on what to do about any difference between their projected usage, and the PO which ISIS cancelled." (Def.'s Ex. 9.)

Clearly, based on the foregoing e-mails, SMTC and Pemstar entered the picture not as additional purchasers to whom Mini-Circuits also intended to make sales, but rather as substitutes for ISIS. Thus, Mini-Circuits could not have had the subjective intent to sell additional products to SMTC and Pemstar, the primary substituted purchasers, prior to ISIS' breach.

With respect to the objective capacity element, it is unclear, based on the facts on the record, whether Mini-Circuits had the capacity to fulfill both ISIS' orders and the orders of additional purchasers. Mini-Circuits asserts that, from April 1, 2001 to December 31, 2004, it was able to sell, in some cases, far more of the cancelled components than the number ordered by ISIS. (Pl.'s Mem. 10-11; Pomerantz Decl. Ex. 5.) According to Mini-Circuits, these numbers alone reflect its capacity to make the additional sales. The court will not make such an assumption. Mini-Circuits' sale of a large quantity of certain components over nearly a four-year period following ISIS' breach does not, in itself, demonstrate Mini-Circuits' capacity to sell to both ISIS and additional purchasers at the time of ISIS' breach. Moreover, ISIS points out that Mini-Circuits required lead times of, in

some cases, as many as eleven to twelve months on ISIS' orders. While it is unclear why Mini-Circuits required such long lead times, this evidence suggests that Mini-Circuits may not have had the ability to sell to additional purchasers at the time of ISIS' breach, beyond the quantity of cancelled items. Thus, on the current record, Mini-Circuits has not adequately demonstrated that it satisfied the capacity element, though it has raised an issue of fact in this regard. Notwithstanding, because Mini-Circuits did not possess the subjective intent to sell to substitute purchasers SMTC and Pemstar prior to ISIS' breach, Mini-Circuits does not qualify as a lost-volume seller. Accordingly, the appropriate measure of damages is "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages . . . but less expenses saved in consequence of the buyer's breach" under U.C.C. § 2-708(1).

2. **Mini-Circuits' Damages Recovery**

Mini-Circuits claims it is entitled to recover damages equal to the price ISIS had agreed to pay for items Mini-Circuits was unable to re-sell under U.C.C. § 2-709(1)(b). ISIS argues that Mini-Circuits has failed to establish any damages and is thus not entitled to any relief.

Where Mini-Circuits has re-sold the cancelled items, as is permitted under U.C.C. § 2-703(d), upon a demonstration that "the resale [was] made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach." U.C.C. § 2-706(1). However, under U.C.C. § 2-709(1), "the seller may recover, together with any incidental damages under the next section, the price . . . (b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be

13

unavailing."

ISIS first argues that Mini-Circuits "did not present any proof of actual damages in the form of cancellation fees." (Def.'s Mem. 24.) Mini-Circuits points out that it "is not claiming damages on the basis of cancellation fees." (Pl.'s Opp. Mem. 14.) Thus ISIS' first argument is moot.

ISIS next argues that Mini-Circuits "did not identify or otherwise segregate the cancelled items." (Def.'s Mem. 24.) However, ISIS itself asserts that Logene Bernstein of Mini-Circuits stated that "all ISIS' cancelled items had always been stored in the warehouse" and that "they had been retested, re-inspected, assigned new run numbers and sold, or at least offered for resale, to new customers." (Def.'s Orig. Mem.[5] 34.) Accordingly, based on ISIS' own assertion, Mini-Circuits implemented a mode of identifying the cancelled items so as to offer them for re-sale, thus overcoming ISIS' second argument.

The next series of ISIS' challenges is, effectively, that Mini-Circuits was ultimately able to sell the cancelled items. ISIS claims that, between March and June 2001, Mini-Circuits had rescheduled and completed delivery to ISIS of a number of the formerly cancelled shipments.[6] ISIS further alleges that Mini-Circuits was also able to re-sell some of the cancelled items to SMTC,

---

[5]"Def.'s Orig. Mem." refers to Defendant's original "Memorandum of Law in Support of Its Motion for Summary Judgment," assigned docket number 72, which, with the permission of the court, Defendant replaced with a revised version, assigned docket number 76, as the original version exceeded the page limit set forth in the court's individual rules.

[6]Plaintiff denies this claim but provides no basis for its denial. (*See* Def.'s 56.1 ¶ 22; Pl.'s Resp. 56.1 ¶ 22.) Defendant further claims that it purchased from Plaintiff $162,436.16 of cancelled parts since March 28, 2001. (Def.'s 56.1 ¶ 23.) Plaintiff stated that it "[n]either admits nor denies" this claim. (Pl.'s Resp. 56.1 ¶ 23.) Moreover, Plaintiff states, in its papers opposing Defendant's motion for summary judgment, that "Mini-Circuits is not requesting damages for the cancelled items that were rescheduled and purchased by Isis," a statement that appears to imply that ISIS did reschedule and purchase some items it had previously cancelled. (*See* Pl.'s Opp. Mem. 14.)

Pemstar, Western Multiplex, and other third-party purchasers. Mini-Circuits concedes that it was able to re-sell some of the cancelled items, but not all of them. To the extent that Mini-Circuits was able to re-sell the cancelled items, ISIS should be credited the re-sale price under U.C.C. § 2-706(1). To the extent that ISIS rescheduled and purchased the cancelled items, ISIS should also receive appropriate credit.

Finally, ISIS argues that Mini-Circuits failed to mitigate its damages. However, it appears that Mini-Circuits sold or offered for re-sale all of the cancelled items. In the absence of evidence that Mini-Circuits did not make a "reasonable effort to resell [the cancelled items] at a reasonable price," as stated in U.C.C. § 2-709(1), the court does not find that Mini-Circuits failed to mitigate its damages.

None of ISIS' foregoing arguments persuade the court that Mini-Circuits should not be able to recover damages pursuant to U.C.C. § 2-706(1) for cancelled items it re-sold or pursuant to U.C.C. § 2-709(1) for items it was unable to re-sell after reasonable effort. Accordingly, Mini-Circuits is entitled to recovery under those provisions.

### 3. Interest and Attorneys' Fees

Mini-Circuits also requests interest and apparently requests attorneys' fees pursuant to paragraph eleven of the terms and conditions listed in the acknowledgment forms it sent in response to ISIS' purchase order forms. In general, courts "'should not infer a party's intention' to provide counsel fees as damages for a breach of contract 'unless the intention to do so is unmistakably clear' from the language of the contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003) (quoting *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989)). Promises to indemnify the other party's attorneys' fees "run against the grain of the accepted policy

that parties are responsible for their own attorneys' fees." *Id.*

As this court has already held, the contract between the parties was formed not by the parties' writings but by the parties' conduct. Accordingly, the terms of the contract are comprised of the terms upon which the parties' writings agree and any supplemental terms provided by the U.C.C. U.C.C. § 2-207(3). The parties' writings do not agree with respect to the issues of interest and attorneys' fees, and the U.C.C. does not supply any term permitting one party to shift its attorneys' fees to the other party. Given the well established policy that parties to a contract are generally responsible for their own attorneys' fees, the court declines to award either party such fees in this action. Rather, each party shall be responsible for its own attorneys' fees.

However, Mini-Circuits is entitled to appropriate prejudgment interest pursuant to the New York Civil Practice Law and Rules § 5001.

## III. Conclusion

For all of the foregoing reasons, the court holds that Defendant breached its contract with Plaintiff and, thus, grants Plaintiff's motion for summary judgment in part and denies Defendant's motion for summary judgment. However, Plaintiff's motion for damages in the amount of $382,773.31 is denied, as the court finds that Plaintiff does not qualify as a lost-volume seller. Moreover, Plaintiff's request for attorneys' fees is denied.

This matter is hereby referred to Magistrate Judge Pollak for a calculation of damages plus interest, in keeping with the findings set forth in this Memorandum and Order.

SO ORDERED.

DATED:    Brooklyn, New York
              March 21, 2008

_____/s/_____
DORA L. IRIZARRY
United States District Judge